1

2                    IN THE UNITED STATES DISTRICT COURT

3              FOR THE EASTERN DISTRICT OF CALIFORNIA

4

5   ELECTRONIC RECYCLERS                    CASE NO. CV F 10-0760 LJO SMS
    INTERNATIONAL, INC. et al.
6
                        Plaintiffs,         **ORDER ON MOTION FOR PARTIAL**
7          vs.                              **SUMMARY JUDGMENT** (Doc. 45)

8   DLUBAK GLASS COMPANY, INC.,
    DAVID A. DLUBAK,
9
                        Defendants.
10   _____/

11

12          Pursuant to notice filed on July 1, 2011, defendant David A. Dlubak and defendant and

    counter-claimant Dlubak Glass Company (collectively "DGC") move for partial summary judgment.
13
    Plaintiffs Electronic Recyclers International, Inc. and Electronic Recyclers of America, LLC
14
    (collectively "ERI") filed an opposition on July 18, 2011.  DGC filed a reply on July 25, 2011.
15
    Pursuant to Local Rule 230(g), this matter is submitted on the pleadings without oral argument, and
16
    the hearing set for August 1, 2011 is VACATED.  Having considered the moving, opposition, and
17
    reply papers, as well as the Court's file, the Court issues the following order.[1]
18
                              **FACTUAL BACKGROUND**
19
    A.      **Factual Overview**
20
            This action arises from an agreement entered into for exclusive glass recycling services and
21
    payment of fees. The basic terms of the agreement involve ERI shipping glass material comprised of
22
    crushed cathode ray tubes from its California facilities to DGC's Yuma, Arizona glass processing
23

24  _____

25          [1] The parties have filed numerous objections to the evidence submitted by the opposing side. The Court has not
    relied on any of the disputed evidence to grant or to deny summary judgment. Where the Court has denied summary judgment
26  as to the claims, the Court found triable issues exist regarding the issues.  To the extent that the Court may have considered
    some of the disputed evidence in finding that triable issues exist regarding the claims, the objections are OVERRULED.
27  Further, the Court is not obligated to consider matters not specifically brought to its attention. Thus, it is immaterial that
    helpful evidence may be located somewhere in the record. The motion and opposition must designate and reference specific
28  triable facts. *Carmen v. San Francisco Unified School Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001).

                                        1

1   facility for further recycling.

2   **B.      ERI Overview**

3       ERI is an electronic waste recycling company.  ERI participates in California's program that
4   allows recyclers to submit payment claims to the state for costs for disposal of "covered electronic
5   waste," including cathode ray tube glass.  This program is referred to as the "SB 20/50" Program.
6   ERI collects cathode ray tubes ("CRTs"), crushes the CRT glass into smaller pieces and packages,
7   and ships the crushed glass to third parties for further processing.  (Doc.1 Complaint ¶11.)  DRG
8   processes ERI's glass shipments containing CRTs for recycling.  (Doc. 1, Complaint ¶12.)  ERI
9   contends that the condition of ERI's glass prior to shipment to DGC was important because it
10  affected the manner in which the glass can be further processed under the SB 20/50 program.

11  **C.      Agreements between the Parties**

12      On September 15, 2006, ERI and DGC entered into two contracts (1) a contract governing
13  the processing of ERI's glass (the "Processing Agreement") and (2) and agreement granting DGC a
14  stock warrant permitting it to purchase 10% of ERI's stock at a price of $0.01 at any time through
15  September 15, 2016 (the "Stock Warrant).  From September 15, 2006, through May 31, 2009, DGC
16  processed approximately 31,000 tons (62 million pounds) of CRT glass received from ERI.  ERI
17  contends that for ERI to be eligible for payment under the SB 20/50 Program, ERI must provide
18  evidence to the state that the CRT glass was treated and shipped to a destination authorized to further
19  treat the glass.

20      Before the parties entered into the Processing Agreement, they had executed a Memorandum
21  of Understanding ("MOU").  In early to mid-2006, the parties executed the MOU outlining the terms
22  of what would be a subsequent agreement.  (See Doc. 46-1, Undisputed Facts no. 17.)  The MOU
23  states, in pertinent part:  "All glass will be processed according to the provisions of California SB
24  20/50."  The MOU was not incorporated into the Processing Agreement, but ERI contends the MOU
25  was intended to provide a framework for the subsequently executed Processing Agreement.

26  **D.      Notice of Violation**

27      On June 16, 2009, the Arizona Department of Environmental Quality ("ADEQ") issued a
28  "Notice of Violation" to DGC alleging various environmental violations at DGC's Yuma, Arizona,

facility.  The Yuma, Arizona facility is the facility which processes ERI's glass shipments.  The violations included lead contamination, permitting violations and glass washing.  In a July 15, 2009 letter, DGC informed ERI that changes to its glass washing facility would occur: "Processing of CRT glass will be done inside a building.  The outside tumble wash operation will be discontinued." (Doc. 45-7, Exhibits, Exh. E.)  ERI contends that DGC ceased its glass washing operation and was not capable of smelting glass.  (Doc. 46, Opposition p.7.)  ERI states DGC was not able to process ERI's CRT glass in a manner which allowed ERI to be paid through the SB 20/50 Program.  *(Id.)* ERI contends that the Processing Agreement obligated DGC to further treat ERI's CRT glass in a manner in which ERI could receive payment for recycling the glass under California's SB 20/50 program.

**E.      The Causes of Action**

ERI alleges the following causes of action:

(1) First cause of action for breach of contract,

(2) Second cause of action for breach of implied covenant of good faith and fair dealing,

(3) Third cause of action for fraud,

(4) Fourth cause of action for negligent misrepresentation,

(5) Fifth cause of action for cancellation of the warrant,

(6) Sixth cause of action for rescission of the Agreement and Warrant,

(7) Seventh cause of action for accounting under the Agreement,

(8) Eighth cause of action for declaratory relief, and

(9) Ninth cause of action for trade libel.

Dlubak Glass filed a counterclaim alleging:

(1) Breach of contract,

(2) Breach of implied covenant of good faith and fair dealing,

(3) Specific performance,

(4) Unjust enrichment,

(5) Reasonable value of processing services, and

(6) Declaratory relief.

3

## ANALYSIS AND DISCUSSION

**A.    Summary Judgment/Partial Summary Judgment Standards**

F.R.Civ.P. 56(b) permits a "party against whom relief is sought" to seek "summary judgment on all or part of the claim."  Summary judgment/adjudication is appropriate when there exists no genuine issue as to any material fact and the moving party is entitled to judgment/adjudication as a matter of law.  F.R.Civ.P. 56( c); *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356 (1986); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The purpose of summary judgment/adjudication is to "pierce the pleadings and assess the proof in order to see whether there is a genuine need for trial."  *Matsushita Elec.,* 475 U.S. at 586, n. 11, 106 S.Ct. 1348; *International Union of Bricklayers v. Martin Jaska, Inc.*, 752 F.2d 1401, 1405 (9th Cir. 1985). On summary judgment/adjudication, a court must decide whether there is a "genuine issue as to any material fact," not weigh the evidence or determine the truth of contested matters.  F.R.Civ.P. 56 ( c); *Covey v. Hollydale Mobilehome Estates*, 116 F.3d 830, 834 (9th Cir. 1997); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598 (1970).

To carry its burden of production on summary judgment/adjudication, a moving party "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  "[T]o carry its ultimate burden of persuasion on the motion, the moving party must persuade the court that there is no genuine issue of material fact." *Nissan Fire*, 210 F.3d at 1102.  "As to materiality, the substantive law will identify which facts are material.  Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505 (1986).

"If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." *Nissan Fire*, 210 F.3d at 1102-1103; *see Adickes*, 398 U.S. at 160, 90 S.Ct. 1598.  "If, however, a moving party carries its burden of production, the nonmoving party must

4

1  produce evidence to support its claim or defense." *Nissan Fire*, 210 F.3d at 1103.  "If the

2  nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the

3  moving party wins the motion for summary judgment." *Nissan Fire*, 210 F.3d at 1103; *see Celotex*

4  *Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548 (1986) ("Rule 56( c) mandates the entry of

5  summary judgment, after adequate time for discovery and upon motion, against a party who fails to

6  make the showing sufficient to establish the existence of an element essential to that party's case,

7  and on which that party will bear the burden of proof at trial.")

8  **B.      Breach of Contract and the Parol Evidence Rule**

9         A central issue in this motion is whether the Processing Agreement is a fully integrated

10  agreement such that parol evidence must be excluded.

11        DGC argues that the Processing Agreement is a fully integrated agreement, and the parol

12  evidence rule bars evidence of prior or contemporaneous oral agreements.  DGC argues that the

13  MOU was superceded by the integrated Processing Agreement, which does not mention the SB

14  20/50 Program.  Therefore, the MOU properly is excluded by the parol evidence rule because the

15  Processing Agreement was integrated and did not incorporate the MOU.  ERI seeks to explain the

16  Processing Agreement by using the MOU.

17        **1.      The Parol Evidence Rule**

18        The parol evidence rule bars the introduction of extrinsic evidence which contradicts the

19  express language of a contract. Cal.Code Civ.Proc. §1856; *BMW of North America, Inc. v. New*

20  *Motor Vehicle Bd.*, 162 Cal.App.3d 980, 990, 209 Cal.Rptr. 50 (1994).  The terms in a writing

21  intended by the parties as a final expression of their agreement cannot be contradicted by evidence of

22  any prior agreement or contemporaneous oral agreement.  Code Civ.Proc. §1856.  The parol

23  evidence rule is a rule of substantive law; making the parties' integrated written agreement their

24  exclusive and binding contract no matter how persuasive the evidence of additional, or different, oral

25  understandings. Evidence of such understandings is legally irrelevant and cannot support a judgment.

26  *Banco Do Brasil, S.A. v. Latian, Inc.*, 234 Cal.App.3d 973, 1000, 285 Cal.Rptr. 870 (1991), *cert.*

27  *denied,* 504 U.S. 986 (1992).

28        California employs a two-step analysis for application of the parol evidence rule: (1) "was the

writing intended to be an integration, i.e., a complete and final expression of the parties' agreement, precluding any evidence of collateral agreements," and (2) "is the agreement susceptible of the meaning contended for by the party offering the evidence?" *Gerdlund v. Electronic Dispensers International*, 190 Cal.App.3d 263, 270, 235 Cal.Rptr. 279 (1987); *see also EPA Real Estate Partnership v. Kang*, 12 Cal.App.4th 171, 176 -177 (1992) (a two-part analysis: (1) was the writing intended to be an integration; and (2) is the agreement reasonably susceptible of the meaning urged by the party offering the evidence).

Here, the Processing Agreement is an integrated agreement.  The Processing Agreement contains an integration clause.  The integration clause states: "This Agreement constitutes the entire agreement between the Parties with respect to the subject matter hereof, and may be amended only by written agreement executed by ERI and Dlubak."  The agreement essentially covered only one topic, glass processing.  There is no reason to suspect the parties intended the integration clause to apply to some, but not all the written terms.

When, as here, a contract is integrated, the next issue to decide is whether evidence of the alleged oral agreement is nevertheless admissible to explain the meaning of the written contractual language.  "The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible." *Banco Do Brasil, S.A. v. Latian, Inc.,* 234 Cal.App.3d at 1008.

**2.    Alleged Ambiguity in the Processing Agreement**

Here, ERI claims a term of the Processing Agreement is ambiguous and the MOU explains certain terms.  ERI contends that the word "approvals" in the Processing Agreement is ambiguous. The Processing Agreement states: "Each party shall maintain all permits, licenses and **approvals** necessary or required for such party to perform its obligations described herein." (emphasis added). ERI contends the word "approvals" is inherently ambiguous and that the prior understanding between the parties was DGC was obligated to remain "approved" so that ERI would receive payment from the SB 20/50 Program.  ERI argues that the heart of the relationship between ERI and DGC was the SB 20/50 Program, and therefore DGC must remain "approved" for ERI to receive

6

1    payments.  ERI argues the MOU explains the term "approval."

2          An ambiguity arises when language is reasonably susceptible of more than one application to

3    material facts.  *Dore v. Arnold Worldwide, Inc.*, 39 Cal.4th 384, 391, 46 Cal.Rptr.3d 668, 673

4    (2006).  As California courts have observed:

5          "[the] meaning of language is to be found in its applications. An indeterminacy in the
      application of language signals its vagueness or ambiguity. An ambiguity arises when
6      language is reasonably susceptible of more than one application to material facts.
      There cannot be an ambiguity per se, i.e., an ambiguity unrelated to an application."

7

8    *Dore v. Arnold Worldwide, Inc.*, 39 Cal.4th at 391 (the phrase "at any time" is not in itself

9    ambiguous with respect to cause for termination does not preclude the possibility that AWI's letter,

10   when considered as a whole, contains ambiguity on the topic); *see also Herzog v. National American

11   Ins. Co.,* 2 Cal.3d 192, 199, fn. 5, 84 Cal.Rptr. 705 (1970) ("language which might be considered

12   ambiguous as applied to some circumstances is not necessarily ambiguous per se".)  "[L]anguage in

13   a contract must be construed in the context of that instrument as a whole, and in the circumstances of

14   that case, and cannot be found to be ambiguous in the abstract."  *Powerine Oil Co., Inc. v. Superior

15   Court*, 37 Cal.4th 377, 391, 33 Cal.Rptr.3d 562, 572 (2005).  Thus, the application of the language to

16   the facts may create an ambiguity.

17          As explained by the California Supreme Court in *Casa Herrera, Inc. v. Beydoun*, 32 Cal.4th

18   336, 343, 9 Cal.Rptr.3d 97 (2004):  "The parol evidence rule ... generally prohibits the introduction

19   of any extrinsic evidence, whether oral or written, to vary, alter or add to the terms of an integrated

20   written instrument. The rule does not, however, prohibit the introduction of extrinsic evidence to

21   explain the meaning of a written contract ... [if] the meaning urged is one to which the written

22   contract terms are reasonably susceptible." *Casa Herrera, Inc*., 32 Cal.4th at 343 (citations omitted).

23   The test for ambiguity is whether the contractual term is reasonably susceptible to more than one

24   meaning.  *Pacific Gas & E. Co. v. G.W. Thomas Drayage etc. Co.*, 69 Cal.2d 33, 37, 69 Cal.Rptr.

25   561 (1968).  Extrinsic evidence may be introduced to explain the meaning of ambiguous contract

26   language. *Hartnell Community College Dist. v. Superior Court*, 124 Cal. App. 4th 1443, 22 Cal.

27   Rptr. 3d 410 (2004).

28          Here, the agreement is reasonably susceptible to the meaning plaintiff urges.  The MOU is

7

consistent with the language and does not contradict the language of the Processing Agreement.  It is undisputed that the parties had engaged in the SB 20/50 Program and that their course of dealing involved this Program.  The purpose of the agreement was for ERI to deliver to DGC glass materials for processing. (Processing Agreement ¶2.)  The objective was recycling of the glass materials.  To that end, each "party shall maintain all permits, licenses and approvals necessary or required for each party to perform it obligations."  (Processing Agreement ¶4.)  Whether the "approvals" required by Processing Agreement meant compliance with the SB 20/50 Program is a reasonably susceptible interpretation of the language, given the parties course of conduct.  *Pacific Gas & E. Co.,* 69 Cal.2d at 40 (If the court decides after considering the evidence that the language of the contract in light of all the circumstances is fairly susceptible of either of the two interpretations argued by the parties, there is an ambiguity and thus extrinsic evidence that is relevant to prove either of such meanings is admissible).

The evidence offered regarding the SB 20/50 program and the MOU do not contradict any express term of the formal contract.  The Processing Agreement does not address the manner of processing the glass.  There is an ambiguity in the language of what is meant by the term "approvals," if compliance with the SB 20/50 Program was not the parties' intent.  Therefore, the Court cannot rule on the breach of contract claim because the contract contains an ambiguity which permits introduction of parol evidence.

### 3.    Partial Summary Judgment on Specific Breaches of Contract

DGC seeks partial summary judgment on specific allegations that DGC breached the Processing Agreement. It seeks partial summary judgment that:

(1)    The Processing Agreement did not require "compliance with the law"[2]

(2)    DGC maintained all permits, licenses and approvals necessary at all times and did not accept ERI glass without the necessary permits, licenses and approvals.

---

[2] DGC argues that partial summary judgment must be granted because the Processing Agreement does not require "compliance with the law." (Doc. 45-1, Moving papers p.7.)  From the Court's review of the Complaint (Doc.1, p.13 of 63), this allegation of breach is an allegation that DGC failed to "maintain all permits, license and approvals."  The Court, therefore, addresses the purported breaches ("compliance with the law" and failed to "maintain all permits, license and approvals") as one-in-the-same.

1    (3)    DGC at all times was able to handle ERI's glass.

2    (4)    ERI would have faced no problems receiving payments under California's e-recycle

3          program had ERI continued shipping glass to DGC.

4    (5)    DGC provided ERI with consultation services.

5    (6)    ERI never made a request to use any proprietary technology.

6          **Breaches (1) - (4):**  Each of these purported breaches go hand-in-hand with

7   Notice of Violation issued to DGC.  It is undisputed that the Arizona Department of Environmental

8   Quality issued a Notice of Violation.  On June 16, 2009, ADEQ issued a "Notice of Violation" to

9   DGC alleging various environmental violations at DGC's Yuma, Arizona, facility.  (Doc. 45-2,

10  Stipulated Fact 10.)  ERI presents evidence that DGC shutdown or reduced its glass washing as a

11  result of the ADEQ inspection and notice.  (Doc. 46-2, Plaintiff's Opposition to fact 7; Doc. 46-1,

12  Separate Statement fact 5, 7.)  Indeed, DGC disputes that it shutdown its glass recycling, and argues

13  that it processed glass "differently."  (Doc. 27, Reply to Disputed facts, fact 5.)  Whether the glass

14  was processed differently or shut down, permanently or temporarily, is a material issue of fact.

15         Further, there were various communications between the parties after the Notice of Violation

16  regarding performance on the contract.  These communications, and their meaning, raise issues of

17  fact regarding whether ERI requested further assurances of performance and whether assurance was

18  given.  DGC disputes that the communications between the parties embodied requests for assurance

19  of performance.  (Doc. 47-3, Reply p. 3.)  DGC further argues that other California recyclers

20  continued to send glass to DGC for processing and thus, this should have been adequate assurance to

21  ERI.  Whether or not adequate assurances of performance were demanded and were given are

22  material issues of fact.

23         ERI also presents evidence that it has received notification for the California Department of

24  Toxic Substances and Control that its SB 20/50 claims paid by California for CRT glass shipped to

25  DGC in 2009 are under investigation.  (See Doc. 46-1, Separate Statement fact 15.)  ERI presents

26  this evidence to show its harm from the Notice of Violation.  Thus, ERI has raised issues of fact on

27  these breaches.

28         **Breach (5):**    DGC claims that it provided consulting services to ERI, and therefore did not

9

1 breach the contract. DGC contends that it provided consultants to ERI who advised ERI about glass

2 processing systems and established glass processing lines at ERI so that ERI could process its own

3 glass. (Doc. 45-1, Moving papers p.10.)

4      The Processing Agreement states: "Dlubak . . . shall assign certain of its agents to provide

5 certain operational consulting services to ERI at ERI facilities . . ." (Processing Agreement ¶3.)

6      It is undisputed the DGC provided consulting services to ERI for glass processing. However,

7 the mere provision of the consulting services by DGC does not end the inquiry. It is disputed

8 whether the consulting services were adequate under the Processing Agreement. ERI raises an issue

9 of fact whether DGC provided adequate consulting services as required by the Processing

10 Agreement. ERI presents evidence that the consulting services provided by DGC resulted in the

11 installation of outdated and unsound equipment which increased ERI's operational costs and

12 produced deficient product. ERI contends these products could not be sent to downstream glass

13 processors. (Doc. 46, Opposition p.12, citing testimony of Tammy Shegerian.) Therefore, ERI has

14 raise an issue of fact as to the breach of the Processing Agreement to provide consulting services.

15      In its reply, DGC argues that the evidence submitted by ERI is insufficient to establish an

16 issue of fact. DGC argues that the testimony relied upon is conclusory lay opinion without specifics

17 to measure "adequate" and how the equipment "failed." (Doc. 47-3, Reply p.5-6.)

18      While the deposition excerpts cited by ERI for Tammy Shegerian do not state her capacity at

19 ERI, DGC's objection is lack of specificity of the testimony, not her lack of personal knowledge to

20 testify as to the topic. *Compare National Steel Corp. v. Golden Eagle Ins. Co.*, 121 F.3d 496 (9th

21 Cir. 1997) (evidence excluded where damages letter offered to substantiate damages was not based

22 upon the letter-writer's personal knowledge). Here, Tammy Shegerian's testimony states that the

23 equipment was installed for the specific purpose of processing glass for one of ERI's customers.

24 (Exh. L, Shegerian Depo. p. 91-97.) The equipment consisted of a conveyor system which separated

25 CRT components in a closed, contained unit and separated the materials between the metals and the

26 organics. (Id. at p. 92.) She testified that the equipment was archaic, increased operating costs and

27 did not function as promised. This evidence raises an issue of fact.

28      **Breach (6):** DGC argues that it did not breach the contract to provide proprietary technology

1  to ERI.  DGC argues ERI never requested DGC to provide it with a perpetual, fully paid license to

2  use any proprietary technology or knowledge of DGC for non-CRT glass.  (Doc. 45-1, Moving

3  papers p. 4.)  DGC argues that ERI never asked for proprietary technology or knowledge, and

4  therefore DGC was not required to provide any.

5        Paragraph 3 of the Processing Agreement provides in relevant part:

6              **If ERI requests**, Dlubak agrees to consult with and provide ERI a
              perpetual, fully paid license to use any proprietary technology and

7              knowledge of Dlubak relating to the establishment and operation of a
              facility to process lighting, windshield, bottle and other non-CRT glass

8              materials…[emphasis added].

9  ERI argues that it requested proprietary technology from DGC, which took the form of the CRT

10  glass processing equipment.  As stated above, ERI presents evidence that the equipment had a

11  detrimental effect on processing.  ERI argues that "proprietary technology" is not defined in the

12  Processing Agreement, and that the processing equipment, which was installed and which did not

13  work, was the proprietary technology.  Whether the equipment installed was proprietary technology

14  within the terms of the Processing Agreement is a question of fact which this Court cannot decide on

15  this motion.

16  **C.**      **Breach of the Implied Covenant of Good Faith and Fair Dealing**

17        DGC argues that the Court should grant partial summary judgment on this claim because

18  DGC did not breach the contract.  This cause of action restates the purported contract breaches as the

19  basis for the claim.

20        The Court has found disputed issues of material fact for each of the alleged contract breaches.

21  There are disputed issues of material fact as to whether DGC processed the glass according to the

22  parties' intent of the Processing Agreement and whether DGC fully performed its obligations under

23  the Agreement.  Accordingly, partial summary judgment will be denied as to this cause of action.

24  **D.**      **Fraud Cause of Action**

25        ERI alleges that DGC induced ERI to enter into the Processing Agreement by promising

26  payment to ERI for non-ERI California CRT class DGC received.  DGC was supposed to pay ERI

27  for glass it accepted from ERI's competitors.  ERI alleges that this promise was false and the DGC

28  did not intent to remit payment to ERI for non-ERI California CRT glass.

1    DGC cites *Alling v. Universal Manufacturing Corp.*, 5 Cal.App.4th 1412, 1433 (1992) for

2  the proposition that the parol evidence rule applies to bar evidence of prior or contemporaneous oral

3  agreement.  DGC argues ERI cannot prove fraud based on DGC's alleged intent not to comply with

4  SB 20/50, where such compliance was not an express part of the integrated agreement.  In *Alling*, the

5  plaintiff sought to introduce a collateral agreement for the express purpose of showing a fraudulent

6  oral promise which was contrary to the parties' integrated agreement.  The collateral agreement was

7  inadmissible under the parol evidence rule because it was inconsistent with explicit terms of the

8  agreement.  The plaintiff corporation could not establish fraud based upon financial projections

9  contained in pre-agreement "business plan" when those provisions were expressly contradicted in

10 agreement actually signed by plaintiff.

11   Here, however, ERI seeks to show that DGC had no intention of performing a promise

12 expressly stated in the Processing Agreement.  ERI does not seek to introduce a separate agreement

13 which was not performed, as was the situation in *Alling*.  ERI seeks to show that DGC had no

14 intention of performing a term in the Processing Agreement, which states, in part: "Dlubak agrees to

15 exclusively credit ERI for all Glass Acceptance Fees generated from any Covered Source Customers

16 . . ."  (Processing Agreement ¶1.)  ERI contends that DGC had no intention of performing this

17 provision.

18   DGC argues that ERI lacks evidence that DGC had no intention of remitting payments.  DGC

19 argues that DGC intended to remit the glass acceptance fees, but the parties had agreed that payment

20 would occur after ERI satisfied its outstanding obligation to DGC for services rendered before the

21 Processing Agreement was executed.[3]  (Doc. 45-3, Facts no. 18.)

22   ERI argues DGC fraudulently induced ERI to enter into the Agreement by falsely promising

23 to pay ERI $0.10 per pound for all non- ERI California CRT glass received by DGC during the life

24 of the Agreement, when in fact DGC had no intention of remitting payments.  (Doc. 46-1, Disputed

25 Fact no. 19.)  ERI argues that it never made any agreement to defer remittance of payments.

26   Here, ERI presents evidence from which a reasonable jury could conclude that DGC lacked

27

28     [3] This purported contract term, for an offset, is not stated in the Processing Agreement, and itself, may be subject
   to the parol evidence rule.  The Court does not reach this issue.

12

1  the intention of remitting glass acceptance fees.  First, it is undisputed that no glass acceptance fees

2  have been paid to ERI.  David Dlubak states that the fees were not owed to ERI because there was an

3  offset.  (Doc. 45-9, Exh. K, Dlubak Decl. ¶11.)  But he does not state that any fees were ever paid.

4  Further, ERI presents testimony from Tammy Shegerian of ERI, that ERI repeatedly requested

5  payment but was not paid and that DGC "was lying to us" and "giving the run around."  (Doc. 46- 4,

6  Exh. L. Shegerian Depo p. 52, 53.)  A reasonable inference from this evidence, failure to pay and not

7  being forthcoming, is that DGC had no intention of paying acceptance fees.  The opposing party's

8  evidence is to be believed and all reasonable inferences that may be drawn from the facts placed

9  before the court must be drawn in favor of the opposing party.  *Anderson*, 477 U.S. at 255;

10  *Matasushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

11  **E.       Negligent Misrepresentation Cause of Action**

12          This claim is based on the same type of allegations as the fraud cause of action.  Both parties

13  argue that if the fraud cause of action fails or succeeds on this motion, the negligent

14  misrepresentation follows suit.  (See Doc. 45-1, Moving paper sp.14; Doc. 46, Opposition p.18.)

15          For the reasons stated in the fraud cause of action, this Court finds issues of fact which

16  preclude partial summary judgment.

17                                    <u>**CONCLUSION AND ORDER**</u>

18          For the foregoing reasons, the Court DENIES defendants' motion for partial summary

19  judgment in its entirety.

20  IT IS SO ORDERED.

21  **Dated:    July 26, 2011**                              /s/ Lawrence J. O'Neill
                                                     UNITED STATES DISTRICT JUDGE
22

23

24

25

26

27

28

                                                   13